UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

THERESA MORAN,

               Plaintiff,                              Civil Action No.
                                                      08-CV-15215

vs.

                                                 PAUL D. BORMAN

REDFORD UNION SCHOOL DISTRICT,           UNITED STATES DISTRICT JUDGE

               Defendant.

_____/

## OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### I.  INTRODUCTION

This is an employment case.  Plaintiff Theresa Moran, a former bus driver for Defendant Redford Union School District, claims that she was terminated from her position in violation of the Family Medical Leave Act ("FMLA") after taking time off work from March 17, 2008, to April 4, 2008.  Defendant argues that Plaintiff is not entitled to relief because she has not engaged in statutorily protected activity under the FMLA.  Alternatively, Defendant contends that Plaintiff cannot show that the purported legitimate, non-discriminatory reason underlying her termination was a pretext for discrimination and retaliation.

Defendant filed a Motion for Summary Judgment on September 18, 2009 [docket entry 18].  Plaintiff filed a response and Defendant filed a reply.  The Court heard oral argument on this matter on December 9, 2009.  For the reasons that follow, the motion will be granted.

### II.  BACKGROUND[1]

---

[1] The background is gleaned from the evidence attached to the parties' papers.

**A.**

Plaintiff was hired by Defendant in September 2001 as a part-time bus driver.  Pl. Dep. at 18-19.  Plaintiff's employment with Defendant was governed by a collective bargaining agreement ("CBA") between Defendant and the Redford Union Custodian and Bus Drivers Association, *see* Def. Ex. B, and by an Employee Code of Conduct.  *See* Pl. Ex. B.  Under the CBA, part-time bus drivers such as Plaintiff are entitled to five days of paid leave per year.  *See* Def. Ex. B, p. 24.

**B.**

Diane Sevigny, Director of Auxiliary Services for Defendant, became Plaintiff's direct supervisor in January 2007.  Sevigny's responsibilities include the oversight of Defendant's Transportation Department.  *See* Sevigny Dep. at 10-11.  On February 2, 2007, Sevigny issued a memo to all part-time bus drivers in which she reminded the bus drivers of Defendant's leave policies and emphasized the importance of regular attendance among bus drivers.  *See* Def. Ex. D. Sevigny's predecessor issued an identical memo the year before.  *See* Def. Ex. E.  Sevigny testified during her deposition that attendance is "vital."  Sevigny Dep. at 75.

**C.**

Defendant states that Plaintiff's employment records reflect a history of absenteeism. According to Defendant, Plaintiff took 21 days off during the 2006-2007 school year.  Plaintiff believes that she was absent from work on less than 21 occasions but admits that she took more than five days off, the number of paid leave days allotted under the CBA.  Pl. Dep. at 29-30.  Plaintiff received a verbal warning regarding her absenteeism on March 1, 2007.  *Id*. at 24.  Four days later, on March 5, 2007, Plaintiff submitted a request for additional vacation time because she was getting married.  *Id*. at 25-26; Sevigny Dep. at 74.  After discussions between Sevigny, Plaintiff, and the

union, Sevigny approved the time off on the condition that Plaintiff would work as scheduled for the remainder of the school year. Sevigny Dep. at 74; Def. Ex. G. Sevigny wrote the following memo to Plaintiff on March 22, 2007:

> I am in receipt of your Employee Time-Off Request Forms dated 3/14/07 and 3/5/07.
>
> I also understand that during this school year, you have been absent from your scheduled position on twenty-one (21) separate occasions. If you wish, we will be glad to pull your file and identify each of these absences with you.
>
> While I recognize that unforeseen circumstances, sudden illness, and emergencies do occur, I also hope you understand that staff absences do cause a disruption within the department and to the District we serve.
>
> I have approved your requests as attached with the strict understanding that you will arrive for work on time as scheduled for the remainder of the 2006-2007 school year. Should you find it absolutely necessary to miss work during this time, I will expect written documentation to excuse such absence. Be assured that attendance issues will be address department-wide. A reminder and clarification on expectations will be sent to all employees promptly.
>
> Please keep a copy of this memo for yourself and sign one to return to me acknowledging your understanding. Should you have any questions regarding this matter, please discuss them with me immediately.
>
> Your understanding and cooperation is expected and appreciated.

Def. Ex. G. The memo is signed by Plaintiff.

## D.

Plaintiff also had attendance issues during the 2007-2008 school year. On March 10, 2008, Plaintiff was given another verbal warning regarding attendance, this time because Plaintiff had exceeded her leave allotment by seven days. Pl. Dep. at 35-36. Plaintiff met with Sevigny and Bob Karrick, then-president of the union, at which time Sevigny informed Plaintiff that her attendance record was unacceptable and that she would not be permitted to take any more days off during the

2007-2008 school year. *Id*. at 36, 39-40.

During the same meeting on March 10, 2008, Plaintiff told Sevigny that she needed two upcoming days off—March 31 and April 1—because she had already purchased airline tickets to Florida, departing March 20, 2008, and returning April 1, 2008. *Id*. at 40; Def. Ex. N (Plaintiff's flight itinerary). When asked why she would purchase airline tickets without first seeking approval for the leave, Plaintiff responded that "life goes by and you forget things, I guess, and I hadn't done it yet." Pl. Dep. at 44. Plaintiff testified as follows regarding her discussion with Sevigny:

> A:   [A]nd then I told her [Sevigny] that I had airline tickets and that I would need an additional two days, and she said, well, no, that she wasn't going to approve those. And I said, well, I've already boughten [sic] airline tickets. And she says, well, I still won't be able to approve those. And I said if I take those two days, what will happen? And she said you'll be – What is the word she used? You'll be reprimanded? I don't remember the word she used. And then probably have a couple of days off.

Pl. Dep. at 39.

## E.

Sometime in the next few days, Plaintiff scheduled a doctor's appointment with her physician, Dr. Robert Brock, D.O. Pl. Dep. at 46. The appointment was set for March 14, 2008, four days after Plaintiff met with Sevigny and Karrick regarding her absenteeism. Plaintiff testified that she had been suffering from lack of sleep, lack of concentration, nausea, irritable bowel, and shakiness. *Id*. at 47. Dr. Brock diagnosed Plaintiff with "acute situational anxiety." Brock Dep. at 23; Pl. Ex. at I.[2] According to Dr. Brock's handwritten notes, Plaintiff's chief complaints were "stress at work," "home getting so bad," and "can't concentrate." Pl. Ex. I. Dr. Brock also indicated

---

[2] Plaintiff has a history of depression. Plaintiff testified that she had previously been hospitalized in 2004 for major depression. Pl. Dep. at 47. Plaintiff sought and obtained a medical leave of absence beginning in December 2004 until approximately April or May 2005.

that Plaintiff was "very tearful" and wrote that she should be off work from 3-17 until 4-7.

Dr. Brock's handwritten notes regarding the dates on which Plaintiff could not work are confusing and "suspicious." *See* Pl. Ex. I. His notes indicate that he considered taking Plaintiff off work until March 22, 2008, but he struck out that date and wrote April 7, 2008, instead, which happened to be shortly after Plaintiff was to return from Florida.

Dr. Brock testified during his deposition as follows regarding this confusion:

Q:    Why the strike-outs?  Do you recall the discussion there?

A:    I don't recall the discussion.  We must have been discussing what dates would be appropriate and, um . . . But I don't know exactly what the discussion was.

Q:    Was it your recommendation that she be off for a period of time or was it her request?

A:    I don't recall if she requested it or not.  It was my recommendation.

* * * *

Q:    Did the strike-outs that's on this progress note indicate that you intended to return her to work, for example, on March 22nd?

A:    I don't know if I could say – I don't – They would have been something I was considering.

Q:    Let me ask you this way: How did you determine how long she should be off?

A:    It was just an estimation of time that – to give her a chance to pull herself together.  I don't know if I had any more detail than that.

Q:    Were those dates that she suggested?

A:    That could have been part of it.  I don't recall the conversation.

Q:    When you say give her time to pull herself together, what were you anticipating was going to – Being off, how was that going to help her situation?

5

> A:    Get away from the sit– get away from the conflict.  Let her calm
>        down.

Brock Dep. at 24-25 (emphasis added).  Dr. Brock later testified that after discussion with Plaintiff,

the two resolved that she would return to work on April 7, 2008.  *Id*. at 54-55.  Thus, Dr. Brock was

quite amenable to working with Plaintiff's scheduling requests.

Dr. Brock did not restrict Plaintiff from activities other than work.  Pl. Dep. at 54-55.

Plaintiff testified that she did inform Dr. Brock of her planned trip to Florida, which was scheduled

to take place during part of her medical leave period, and Dr. Brock responded that she should go

as planned because she "need[s] to relax."  *Id*. at 55.  Dr. Brock, on the other hand, testified during

his deposition that Plaintiff did not mention anything about a planned trip:

> Q:    Did she [Plaintiff] indicate anything about she had a trip planned that
>        her superviser was not going to let her take time off for?
>
> A:    She did not tell me that.
>
> Q:    Did she tell you anything about going to Florida?
>
> A:    Not that I recall.
>
> Q:    So if she testified that you told her going to Florida would help her
>        condition, that would not be accurate; is that correct?
>
> A:    I don't recall that discussion.

Brock Dep. at 30.  Thus, Plaintiff testified that she informed Dr. Brock about her Florida vacation

plans; Dr. Brock did not recall any such revelation.

After her doctor's appointment on March 14, 2008—and in fact, later on the same

day—Plaintiff submitted a handwritten request to Defendant for a medical leave of absence effective

March 17, 2008, through April 7, 2008, along with a note from Dr. Brock stating that Plaintiff "is

unable to work 3-17-08 thru 4-7-08 [secondary] to medical disability."  Pl. Ex. F-G.  Plaintiff

testified that she requested FMLA papers on March 14, 2008, but was told by a secretary in Defendant's transportation office that she "just need[ed] to write out the request for medical." Pl. Dep. at 94.

### F.

Plaintiff stayed at home during the first three days of her leave period (from March 17 until March 19). *Id*. at 57. Plaintiff then traveled to Florida as planned from March 20 until April 1. *Id*. at 9. All together, and taking into account school vacation days, Plaintiff missed nine days of work as a result of her medical leave.[3]

### G.

In light of the coincidental timing of Plaintiff's leave request, Defendant determined that an investigation was necessary. Sevigny Dep. at 40. The investigation commenced on March 17, the first day of Plaintiff's leave period. On that day, Debra Dahlam, Defendant's Human Resources Coordinator, called Dr. Brock's office and spoke to the receptionist. Dahlam Dep. at 16-17. After being placed on hold, Dahlam was told by the receptionist: "[a]ll I can tell you is that she is totally incapacitated." *Id*. at 17.

Dahlam also called Plaintiff in order to obtain more information about her medical situation. *Id*. at 19. Dahlam called Plaintiff's home on March 17, March 18, March 19, and March 20, but Plaintiff did not answer.[4] *Id*. Plaintiff has caller I.D. on her phone, but testified that she does not check it often and did not see that the school district called. Pl. Dep. at 59-60. Although an

---

[3] The school was closed for spring break from March 21 through March 30 with classes to reconvene on March 31, at which point Plaintiff would have resumed working. Accordingly, Plaintiff missed work on March 17-20 and March 31-April 4.

[4] As noted above, Plaintiff testified that she was at home during the first three days of her leave period until she left for Florida on March 20.

answering machine picked up, Dahlam did not leave a message for Plaintiff because of the subject matter.[5]  Dahlam Dep. at 19.

Sevigny sent a memo dated April 1, 2008, to Plaintiff via mail.  Def. Ex. O; Sevigny Dep. at 27.  The body of the memo reads as follows:

> The District is in receipt of the medical note from your physician that states you could not work during the dates of March 17, 2008 through April 7, 2008.  From conversation with your physician's office, we understand that you were completely incapacitated for that time.
>
> We have tried to contact you by phone numerous times over the last few weeks to arrange an appointment for a medical evaluation done at the cost of the District.  We were unsuccessful in reaching you.
>
> Before you are permitted to return to your regular position, I must require documentation from a physician that states you are physically able to return and complete all responsibilities of your position as a bus driver.
>
> If you do not have documentation of this clearance from a physician, I am requesting that you do not begin work.  You must submit this documentation and receive approval before returning to work.
>
> Should you have any questions regarding this matter, please discuss them with me promptly.  I can be reached on my cell phone . . .

Def. Ex. O.  Plaintiff received Sevigny's memo after she returned home from Florida.  Pl. Dep. at 60-61.  Plaintiff scheduled an appointment with Dr. Brock for April 3, 2008, at which time Dr. Brock signed a note stating that Plaintiff "may return to work without restrictions on 4-8-08."  Pl. Ex. P.  Plaintiff then faxed Dr. Brock's note to Daisy Carignan, Sevigny's secretary.  Pl. Dep. at 64.

**H.**

---

[5] When asked during her deposition why she did not leave a message, Dahlam testified: "Well, because of the suspicious circumstances with the prior meeting and then the leave I wanted to talk to [Plaintiff] directly to get more information, ask her about restrictions or possibly an [independent medical examination], and I didn't want to leave that on an answering machine."  Dahlam Dep. at 33.

On April 7, Plaintiff received a phone call from Carignan. *Id*. Carignan told Plaintiff not to report to work on April 8, her first scheduled day back from leave, but rather to report to the school board office for a meeting. *Id*. at 64-65.

The meeting took place in the morning on April 8. *Id*. at 65. The following six individuals were present: Plaintiff, Sevigny, Dahlam, Edward Callaghan,[6] and two union officials, Karrick and Joe St. Peter. Callaghan did almost all of the talking on behalf of Defendant. Sevigny Dep. at 36. The meeting is described in some detail on pages 66-72 of Plaintiff's deposition, pages 21-23 of Dahlman's deposition, and pages 36-39 of Sevigny's deposition. In sum, the following undisputed facts regarding the meeting are relevant:

- The purpose of the meeting was to "find out the legitimacy of [Plaintiff's] doctor's statement." Callaghan Dep. at 38.

- Plaintiff testified that the meeting started out with Callaghan "grilling her" with questions about her medical leave. Pl. Dep. at 67.

- Dahlman testified that: "When [Plaintiff] came in [to the meeting] she started out by saying that were we aware that she was American Indian and was this happening because she was a woman or an American Indian." Dahlman Dep. at 21-22.

- Although asked, Plaintiff did not share any information at the meeting regarding her incapacitating medical condition because Plaintiff "didn't think it was any of their business." Pl. Dep. at 69-70. In their respective depositions, Dahlman and Sevigny both recounted Plaintiff's statement to the effect that her medical condition was none of anyone's business. Dahlman Dep. at 22; Sevigny Dep. at 38.

- Plaintiff testified that "Callaghan right out told [her] he didn't believe [she] had a medical disability" and that he "thought that [she] just made the whole thing up and that [Dr. Brock] was a liar." Pl. Dep. at 68-69.

- Plaintiff was told that she was being suspended pending the outcome of the investigation. Callaghan Dep. at 39.

_____

[6] Dr. Callaghan is a part-time consultant to Defendant's Superintendent. Callaghan Dep. at 9. His primary job is to "help out Debbie Dahlam and the Human Resources Department." *Id*. at 10.

9

Plaintiff testified that no one asked her during the meeting or at any other time to sign an authorization for the release of her medical records. Pl. Dep. at 69. However, Dahlman testified that Plaintiff was asked to sign a medical release during the April 8 meeting but that Plaintiff refused. Dahlman Dep. at 34. Callaghan testified that when Plaintiff was asked during the meeting if she would allow Defendant to get more definitive information regarding her medical statement, she responded by saying that it is none of anyone's business. Callaghan Dep. at 75-76. Plaintiff's deposition testimony confirms her refusal to provide further information regarding her medical situation. Pl. Dep. at 69-70. Sevigny testified that she believes that Callaghan asked Plaintiff to sign a medical release during the meeting. Sevigny Dep. at 77. Finally, in Plaintiff's Step I Grievance, discussed below, in the paragraph discussing the April 8 meeting, Plaintiff wrote: "<u>Due to the private nature of my illness, I was not willing to sign a release of my records</u>." Def. Ex. Q (emphasis added). When asked why she wrote this in her grievance if she had never been asked to sign a medical release, Plaintiff testified as follows:

> A:    That was put in there -- Actually, I had help writing this, and that was put in there by mistake, because I was never asked in that meeting [to sign a release].

> Q:    You said you had help writing this. Who helped you write this?

> A:    My sister-in-law.

> Q:    She wasn't present at that meeting, correct, the April 8th meeting?

> A:    Correct.

> Q:    So when you say this was put in there by mistake, this was put in there by your sister-in-law.

> A:    Yes.

Pl. Dep. at 79. The grievance form bears Plaintiff's signature, *see* Def. Ex. Q, and is very credible evidence.

## I.

After the April 8 meeting, Plaintiff filed Step I and Step II grievances with Defendant alleging a violation of her FMLA rights. *See* Pl. Ex. R. The grievances were denied. *See id.*

## J.

Also after the April 8 meeting, union officials, Callaghan, Dahlman, and Sevigny began negotiating Plaintiff's return to work under a "Last Chance Agreement." Dahlman Dep. at 25-26; Pl. Dep. at 102. Three different drafts were negotiated and prepared. *See* Def. Ex. S. All three drafts contained the same material provisions; namely, (1) Plaintiff would be reinstated, but her employment would be "immediately terminated" should she violate any rules "regarding requesting and receiving approval for any absence from work"; (2) "Should [Plaintiff's] employment be terminated for any reason covered by [the] Agreement, she agrees to completely forgo the grievance procedure"; and (3) Plaintiff "releases and discharges [Defendant] . . . and her union from any liability for any claim which [Plaintiff] may have pertaining to her employment." *Id.* The third and final proposed agreement contained a provision limiting the life of the agreement to twelve months from the date of its execution, after which point Plaintiff's full rights under the CBA would be restored. *Id.*

Plaintiff testified that Karrick told her that the first draft was harsh and recommended that she not sign it. Pl. Dep. at 100-101. Plaintiff also testified that she took issue with the provision, quoted above, requiring her to "release and discharge" Defendant from any claim she may have. *Id.* at 102. According to Plaintiff, she told Defendant that she would sign a copy of the agreement

if the "release and discharge" provision was removed. *Id.* Although Plaintiff's union recommended that she sign the third draft of the agreement, Plaintiff refused. *Id.* at 106-107.

**K.**

Plaintiff submitted her Certification of Health Care Provider form to Donna Rhodes, Defendant's Superintendent, on May 3, 2008. The form, which was completed and signed by Dr. Brock on April 30, 2008, indicates that Plaintiff was suffering from "acute situational anxiety [secondary] to home and work." Def. Ex. R. This was the first time Defendant was made aware of the allegedly incapacitating condition that necessitated Plaintiff's medical leave.

**L.**

Plaintiff was terminated via letter dated June 11, 2008, after her refusal to sign the Last Chance Agreement. *See* Def. Ex. T. The termination letter, which was written and signed by Sevigny, stated that Plaintiff was being terminated "[a]s a result of [her] refusal to accept the terms of the Last Chance Agreement." *Id.* Dahlman testified that "[w]e did not want to terminate [Plaintiff] but did so because she refused to sign the Last Chance Agreement. Dahlman Dep. at 29. Callaghan testified that Plaintiff was terminated because "[s]he was AWOL. She abandoned her job" and because "she was not cooperative in trying for us to determine the legitimacy of her health leave." Callaghan Dep. at 66.

**M.**

Plaintiff filed the present action in Wayne County Circuit Court on November 13, 2008. Defendant removed the case to this Court. The Complaint contains one count for violation of the FMLA. Defendant filed the present Motion for Summary Judgment on September 18, 2009.

**III.  SUMMARY JUDGMENT STANDARD**

Pursuant to Fed. R. Civ. P. 56(b), a party against whom a claim is asserted may "at any time, move with or without supporting affidavits, for a summary judgment in the party's favor as to all or any part thereof." Summary judgment is appropriate where the moving party demonstrates that there is no genuine issue of material fact as to the existence of an essential element of the nonmoving party's case on which the nonmoving party would bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Of course, [the moving party] always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id*. at 323.

A fact is "material" for purposes of a motion for summary judgment where proof of that fact "would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties." *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (quoting Black's Law Dictionary 881 (6th ed. 1979)) (citations omitted). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248 (1986). Conversely, where a reasonable jury could not find for the nonmoving party, there is no genuine issue of material fact for trial. *Feliciano v. City of Cleveland*, 988 F.2d 649, 654 (6th Cir. 1993). In making this evaluation, the court must examine the evidence and draw all reasonable inferences in favor of the non-moving party. *Bender v. Southland Corp.*, 749 F.2d 1205, 1210-1211 (6th Cir. 1984).

If this burden is met by the moving party, the non-moving party's failure to make a showing that is "sufficient to establish the existence of an element essential to that party's case, and on which

that party will bear the burden of proof at trial," will mandate the entry of summary judgment. *Celotex*, 477 U.S. at 322-323. The non-moving party may not rest upon the mere allegations or denials of his pleadings, but the response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts which demonstrate that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). The rule requires the non-moving party to introduce evidence of evidentiary quality" demonstrating the existence of a material fact. *Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997).

## IV. ANALYSIS

### A. The FMLA, Generally

Under the FMLA, "an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period . . . [b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D).

> [A]ny eligible employee who takes leave . . . for the intended purpose of the leave shall be entitled, on return from such leave–(A) to be restored by the employer to the position of employment held by the employee when the leave commenced; or (B) to be restored to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment.

29 U.S.C. § 2614(a)(1). The Act makes it unlawful for a covered employer to "interfere with, restrain, or deny the exercise of or the attempt to exercise" a right under the FMLA or to "discharge or in any other manner discriminate against any individual for" exercising an FMLA right. 29 U.S.C. § 2615(a)(1) and (2). "Two distinct theories of recovery arise under these statutes." *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 507 (6th Cir. 2006). "Under the entitlement theory (which some courts refer to as the interference theory), '[t]he issue is simply whether the employer provided its employee the entitlements set forth in the FMLA–for example, a twelve-week leave or reinstatement

14

after taking a medical leave.'" *Id.* (quoting *Arban v. W. Publ'g Corp.*, 345 F.3d 390, 401 (6th Cir. 2003)).  As stated by the Sixth Circuit,

> [t]o prevail on an entitlement claim, an employee must prove that: (1) she was an eligible employee, (2) the defendant was an employer as defined under the FMLA, (3) she was entitled to leave under the FMLA, (4) she gave the employer notice of her intention to take leave, and (5) the employer denied the employee FMLA benefits to which she was entitled.

*Id*.

Retaliation claims, on the other hand, "impose liability on employers that act against employees specifically because those employees invoked their FMLA rights."  *Id*. at 508. According to the Sixth Circuit,

> the FMLA . . . affords employees protection in the event they suffer retaliation or discrimination for exercising their rights under the FMLA. Specifically, "[a]n employer is prohibited from discriminating against employees . . . who have used FMLA leave," nor can they "use the taking of FMLA leave as a negative factor in employment actions."

*Arban*, 345 F.3d at 403 (quoting 29 C.F.R. § 825.220(c)).  To prevail on a retaliation claim,

> [a] plaintiff must typically make a prima facie showing that: (1) he engaged in a statutorily protected activity; (2) he suffered an adverse employment action; and (3) a causal connection exists between the protected activity and the adverse employment action.

*Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 707 (6th Cir. 2008).  Importantly, however, "[a]n employee has no greater right to reinstatement or to other benefits and conditions of employment than if the employee had been continuously employed during the FMLA leave period."  29 C.F.R. § 825.216(a).  *See also* 29 U.S.C. § 2614(a)(3)(B) ("[n]othing in [ 29 U.S.C. § 2614] shall be construed to entitle any restored employee to . . . any right, benefit, or position of employment other than any right, benefit or position to which the employee would have been entitled had the employee not taken the leave").

15

"A plaintiff asserting a claim of retaliation under the FMLA must produce either direct or circumstantial evidence of such retaliation." *Alston v. Sofa Express, Inc.*, 2007 WL 3071662, at *10 (S.D. Ohio Oct. 19, 2007). "Direct evidence generally involves an admission or a statement by the decision maker regarding his discriminatory intent." *Lewis v. Sch. Dist. #70*, 523 F.3d 730, 742 (7th Cir. 2008). As stated by the Sixth Circuit,

> direct evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." "Consistent with this definition, direct evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group." "In direct evidence cases, once a plaintiff shows that the prohibited classification played a motivating part in the employment decision, the burden of both production and persuasion shifts to the employer to prove that it would have terminated the employee even if it had not been motivated by impermissible discrimination."

*In re Rodriguez*, 487 F.3d 1001, 1007 (6th Cir. 2007) (citations omitted).

"Absent direct evidence of unlawful conduct, FMLA-retaliation claims are evaluated according to the tripartite burden-shifting framework announced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)." *Bryson v. Regis Corp.*, 498 F.3d 561, 570 (6th Cir. 2007). The Sixth Circuit has explained the *McDonnell Douglas* burden-shifting framework as follows:

> At the outset, "the plaintiff's burden is merely to present evidence from which a reasonable jury could conclude that the plaintiff suffered an adverse employment action under circumstances which give rise to an inference of unlawful discrimination." There are "various context-dependent ways by which plaintiffs may establish a prima facie case." One of the ways in which we have previously held that a plaintiff may make out a prima facie case is by showing that (1) she engaged in a statutorily protected activity, (2) she suffered an adverse employment action, and (3) there was a causal connection between the adverse employment action and the protected activity.

16

> If the plaintiff satisfies her prima facie showing, the burden shifts to the defendant to offer evidence of a legitimate, non-discriminatory reason for the adverse employment action.  If the defendant succeeds, the burden shifts back to the plaintiff to show that the defendant's proffered reason is a pretext for unlawful discrimination.  "Although the burdens of production shift, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'"

*Id.* (citations and explanatory parenthetical omitted).

## B.  The Positions of the Parties

### 1.  *Defendant's Position*

Defendant argues that it is entitled to summary judgment for two reasons.  First, Defendant contends that Plaintiff has not engaged in statutorily protected activity under the FMLA.  Defendant states that Plaintiff requested a medical leave for illegitimate purposes—namely, to allow her to take a pre-planned trip to Florida—and that she therefore misused her medical leave.  Defendant relies upon 29 C.F.R. § 825.216(d), *Crouch v. Whirlpool Corp.*, 447 F.3d 984 (7th Cir. 2006), and *Stonum v. U.S. Airways, Inc.*, 83 F. Supp.2d 894 (S.D. Ohio 1999), discussed below, in support of its position.

Second, Defendant argues that it has articulated a legitimate, non-discriminatory reason for Plaintiff's termination and that Plaintiff cannot demonstrate that the proffered reason is pretextual.  According to Defendant, Plaintiff exhibited a "blatant disregard for [Defendant's] attendance rules" when she refused to sign the Last Chance Agreement.  As stated by Defendant,

> [t]here can be no question that the School District reasonably believed that Plaintiff had misused the leave time.  Rather than discharge her from employment based on that belief, she was given a last chance to adhere to the attendance policy via a Last Chance Agreement.  Her rejection and refusal to sign same was an indication of her unwillingness to demonstrate satisfactory attendance.  Her discharge in the face of such blatant disregard

17

for the employer's attendance rules was a legitimate, non-discriminatory reason. Plaintiff has presented no evidence to show that the School District's reason for terminating her employment was pretext for discrimination or retaliation based on Plaintiff having taken a leave.

Defendant sought time and again to ascertain whether Plaintiff had a justification for her leave. Time and again, Plaintiff refused to explain or to allow Defendant access to her medical records.

Defendant further argues that it is entitled to summary judgment because Plaintiff did not furnish her medical certification in a timely manner. *See* 29 C.F.R. § 825.305(b) (requiring an employee to "provide the requested certification to the employer within 15 calendar days after the employer's request").

### 2. *Plaintiff's Position*

With regard to Defendant's first argument, Plaintiff disagrees with Defendant's assertion that she misused her FMLA leave. As stated by Plaintiff,

> Defendant has not produced one shred of evidence to prove that [Plaintiff] submitted false information to obtain an FMLA leave, or used her leave for an illegitimate purpose. [Plaintiff] never lied to her employer about having airline tickets . . . and when she was questioned at the April 8 meeting she also acknowledged having traveled to Florida. Travel to Florida was also not inconsistent with her diagnosis of acute situational anxiety, and the only restriction Dr. Brock placed on her was working as a school bus driver.

Moreover, Plaintiff argues that the case upon which Defendant relies in support of its argument, *Crouch*, is irrelevant here and that Defendant violated its obligation under 29 C.F.R. § 825.301(a) to "inquire further of the employee . . . to ascertain whether leave is potentially FMLA-qualifying." This argument does not fly since Defendant, time and again, has been trying unsuccessfully to get access to Plaintiff's medical records, which are of significant relevance to Plaintiff's claim under the Family <u>Medical</u> Leave Act.

With regard to Defendant's second argument, Plaintiff contends that the "legitimate, non-

discriminatory" reason offered by Defendant for Plaintiff's termination (failure to sign the Last Chance Agreement) is a pretext for unlawful discrimination. In support of her argument, Plaintiff states that Defendant "has not been consistent in its reasons for terminating [her]." Plaintiff contends that Defendant "did virtually nothing to investigate or substantiate its theory" that Plaintiff has misused her leave and that Defendant's belief "is based on pure conjecture and speculation." Moreover, Plaintiff argues that Defendant was not entitled to terminate her based on her failure to sign the Last Chance Agreement because she "was not obligated . . . nor was there any good reason that she should have signed a last chance agreement." Plaintiff's argument ignores the fact that the Last Chance Agreement issue arose because Plaintiff refused to provide access to her medical records. This is an example of a good deed by Defendant – giving Plaintiff a last chance even though she refused to provide access to her medical records – and then having that good deed turned against it. As they say, no good deed goes unpunished. Here, Plaintiff seeks to punish Defendant, who— despite her serial absenteeism, suspicious justifications, and refusal to provide access to her medical records—gave her a last chance.

## C. Discussion

The Court first addresses Defendant's argument that Plaintiff was not entitled to protection under the FMLA because it reasonably believed that Plaintiff misused her medical leave. The Court then addresses Defendant's second argument involving pretext.

### 1. *Has Defendant Demonstrated that Plaintiff Misused Her Medical Leave?*

"The FMLA return-to-work provision applies . . . only to employees on leave from work 'for the intended purpose of the leave.'" *Crouch*, 447 F.3d at 986 (quoting 29 U.S.C. § 2614(a)(1)). Thus, "[a]n employee who fraudulently obtains FMLA leave from an employer is not protected by

FMLA's job restoration . . . provision[]." 29 C.F.R. § 825.216(d). *See also Crouch*, 447 F.3d at 986 ("an employer is under no obligation to reinstate an employee who misuses disability leave"). According to the Sixth Circuit, "[e]ven an employer's honest suspicion that the employee was not using his medical leave for its intended purpose is enough to defeat the employee's substantive rights FMLA claim." *Crouch*, 447 F.3d at 986. However, the honest belief must "be reasonably based on particularized facts." *Smith v. Chrysler Corp.*, 155 F.3d 799, 806 (6th Cir. 1998). Moreover,

> [i]n deciding whether an employer reasonably relied on the particularized facts then before it, we do not require that the decisional process used by the employer be optimal or that it left no stone unturned. Rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action. Although courts should resist attempting to micro-manage the process used by employers in making their employment decisions, neither should they blindly assume that an employer's description of its reasons is honest. When the employee is able to produce sufficient evidence to establish that the employer failed to make a reasonably informed and considered decision before taking its adverse employment action, thereby making its decisional process "unworthy of credence," then any reliance placed by the employer in such a process cannot be said to be honestly held.

*Id*. at 807-808 (citation and explanatory parenthetical omitted).[7]

---

[7] It should be noted that the law in the Seventh Circuit is different. The Seventh Circuit, and those courts following it, adhere to the so-called "honest belief" rule. As stated by the Sixth Circuit, the honest belief rule,

> as developed in a series of Seventh Circuit decisions, provides that so long as the employer honestly believed in the proffered reason given for its employment action, the employee cannot establish pretext even if the employer's reason is ultimately found to be mistaken, foolish, trivial, or baseless.

*Smith*, 155 F.3d at 806. The Sixth Circuit has explicitly rejected the "honest belief" rule, holding that an employer's honest belief must be "reasonably grounded on particularized facts that were before it at the time of the employment action":

Two cases, both of which are cited by Defendant, inform the Court's analysis. The first is the Seventh Circuit's decision in *Crouch*[8] and the second is *Stonum v. U.S. Airways, Inc.*, 83 F. Supp.2d 894 (S.D. Ohio 1999).[9] The plaintiff and his wife in *Crouch* were both employees of the defendant. 447 F.3d at 984-985. The couple attempted to coordinate their vacation schedules by requesting the same days off for vacation. The wife was granted vacation time on the days sought but the plaintiff's request was partially denied. *Id*. at 985. The plaintiff then requested disability leave for the dates on which he was denied, but his wife was granted, vacation time. *Id*. In support of his request, the plaintiff submitted a doctor's note certifying that he was disabled. *Id*. The plaintiff's leave request was granted based, in part, on the doctor's note. *Id*.

After noticing that the dates of the plaintiff's disability leave were the same as the dates on which he sought—but was denied—vacation time, the employer discovered that the plaintiff had gone on disability leave the year before, at the same time of year, because of the same reason (a knee

---

The Seventh Circuit, however, apparently does not require an employer to demonstrate that its belief was reasonably grounded on particularized facts that were before it at the time of the employment action. Instead, for the rule to apply, the employer need only provide an honest reason for firing the employee, even if that reason had no factual support. We find such an abstract application of the rule to be at odds with the underlying purpose behind the Act- i.e., that employment actions taken regarding an individual with a disability be grounded on fact and not "on unfounded fear, prejudice, ignorance, or mythologies." To the extent the Seventh Circuit's application of the "honest belief" rule credits an employer's belief without requiring that it be reasonably based on particularized facts rather than on ignorance and mythology, we reject its approach.

*Id*. (citations and explanatory parentheticals omitted).

[8] *Crouch* is a Seventh Circuit case and therefore followed the "honest belief" rule.

[9] *Stonum* was decided by a court in the Sixth Circuit and therefore followed the "particularized facts" rule.

injured during yard work), and—again—following a denied vacation request. *Id*. Suspicious, the employer hired a private detective service, which videotaped the plaintiff doing 48 minutes of yard work during his disability leave. *Id*. After a review of the tape, the employer determined that the plaintiff had engaged in activities inconsistent with his medical leave and suspended the plaintiff pending an investigation into whether he had falsified a form in violation a company rule stating that the falsification of forms constitutes just cause for termination. *Id*.

The employer held a hearing at which the plaintiff stated no reason why he should not be terminated and admitted vacationing in Las Vegas during his leave period. *Id*. The employer then terminated the plaintiff for falsely applying for medical leave, prompting the plaintiff to file a lawsuit alleging that his employer violated the FMLA by not restoring him to his prior position upon return from leave. *Id*. The employer argued that the plaintiff's FMLA claim was foreclosed by the employer's honest belief that the plaintiff misused his medical leave. *Id*. The trial court agreed and granted summary judgment in favor of the employer on this basis. *Id*. at 985, 988. The Seventh Circuit affirmed, holding that

> [a]t summary judgment, [the employer] demonstrated its honest belief that [the plaintiff] was using his leave for vacation purposes instead of the intended purpose, recovery from an injured knee. Its suspicion resulted both from the coinciding dates of his vacation and disability leave requests and from the identical reasons he gave for the two disability leaves. The surveillance video . . . confirmed the suspicion.

*Id*. at 986. Citing 29 C.F.R. § 825.216(a), quoted above, the Seventh Circuit also noted that the employer had just cause to terminate the plaintiff based on his falsification of company forms. As stated by the court, "[b]ecause [the employer] could terminate [the plaintiff] for this violation while he was at work, it could also terminate him for it while he was on leave." *Id*. at 986.

Defendant also relies upon *Stonum*. The plaintiff in that case was an employee of the

defendant-airline who requested that she be permitted to take three hours of FMLA leave time per day to care for her mother. 83 F. Supp.2d at 895-896. The request was approved and the plaintiff began leaving early each day without incident until the airline received a tip from another employee that the plaintiff was using her FMLA leave for illegitimate purposes. *Id*. at 896. After receiving the tip, the airline hired a private investigator who observed the plaintiff spending only a fraction of her designated FMLA leave time with her mother. *Id*. Thereafter, the plaintiff attempted to take, but was denied, vacation time around the Christmas/New Years holiday. *Id*. After the denial of her request for vacation time, the plaintiff used FMLA leave in order to obtain the time off work. Highly suspicious, the airline again invoked the services of the private investigator, who, again, observed that the plaintiff was spending very little of her FMLA leave time with her mother. *Id*. at 896-897. After the private investigator provided the airline with the surveillance videotapes, still photographs, and a written report, the plaintiff was given two chances to explain her actions. *Id*. at 897. The plaintiff denied abusing her FMLA leave both times, at which point she was terminated. *Id*.

The plaintiff then sued the airline, arguing that she was terminated in violation of the FMLA. The *Stonum* court determined that the record contained "particularized facts" supporting the airline's decision to terminate the plaintiff for misusing her FMLA leave; namely, (1) the tip from the plaintiff's co-worker that the plaintiff had been misusing her FMLA leave, (2) the plaintiff's increased use of FMLA leave, (3) the suspicious timing of her leave request (after having been denied vacation time), and (4) the report from the private investigator demonstrating that the plaintiff had been spending only a fraction of her FMLA leave time with her mother. *Id*. at 902. In light of these facts, the court determined that the airline's "conclusion that [the plaintiff] has abused her

FMLA leave was both reasonable and based upon particularized facts." *Id*.

Neither *Crouch* nor *Stonum* directly support Defendant's position because both cases differ from the present case in one crucial respect: *Crouch* and *Stonum* both involve situations where the respective plaintiffs were caught "red-handed" performing activities while on their FMLA leave that were plainly inconsistent with their respective medical leaves. Specifically, the plaintiff in *Crouch*, who was on medical leave due to a knee that he injured while doing yard work, was caught performing yard work on his injured knee. Likewise, the plaintiff in *Stonum*, who was on medical leave to care for her mother, was caught spending only a fraction of her FMLA leave with her mother. Both plaintiffs were caught red-handed misusing their leave. Conversely, here, Plaintiff's disabling condition was "acute situational anxiety." There is nothing plainly inconsistent about traveling to Florida while at the same time suffering from "acute situational anxiety."[10] A jury could conclude that Plaintiff did not engage in any activities that are inconsistent with her medical leave. This was not the case in *Crouch* and *Stonum* inasmuch as it would have been impossible for any jury to conclude, in light of the surveillance conducted by the respective private investigators, that the respective plaintiffs were not misusing their FMLA leave. For this reason, neither *Crouch* nor *Stonum* directly control here.

On the other hand, Plaintiff's obstruction of Defendant's legitimate request for her medical records, in evaluating Plaintiff's late justification for her trip to Florida/leave under the FMLA, provides specific facts to support termination after Plaintiff's rejection of the Last Chance Agreement.

---

[10] In fact, Plaintiff testified that Dr. Brock told her she should go on the trip as planned because she "need[s] to relax." Pl. Dep. at 55. On the other hand, Dr. Brock testified that he does not recall Plaintiff saying anything about a trip to Florida. Brock Dep. at 30.

The relevant inquiry, once again, is whether Defendant held an honest belief based on particularized facts that Plaintiff had misused her FMLA leave. *See Smith*, 155 F.3d at 806. Further, "the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action." *Id*. at 807. There is no doubt, as Plaintiff's counsel conceded during oral argument, that the circumstances under which Plaintiff requested and took leave in this case are highly suspicious. Indeed, Plaintiff's request for FMLA leave immediately proceeded a denied vacation request for which Plaintiff had pre-purchased airline tickets. Moreover, following the denied vacation request, Plaintiff asked what would happen if she took the days off anyway and was told that she would be reprimanded "[a]nd then probably [would] have a couple of days off." Dr. Brock's notes as to the dates that Plaintiff should be off work are even suspicious inasmuch as he inexplicably crossed off certain dates in favor of other dates while at the same time testifying that the dates on which he finally settled may have been suggested by Plaintiff. All this, combined with Plaintiff's history of absenteeism and the fact that she did not answer Dahlam's phone calls on March 18-20, when she was admittedly at home, demonstrates that Defendant undisputably held an honest belief that Plaintiff was misusing her FMLA leave. Adding to this Plaintiff's refusal to agree to provide her medical records, as requested by Defendant, leads the Court to conclude, as a matter of law, that Defendant "made a reasonably informed and considered decision" before terminating Plaintiff.

> 2. *Defendant Has Offered A Legitimate, Non-Discriminatory Reason*
> *For Plaintiff's Termination – Her Refusal to Provide Access To*
> *Her Medical Records Legitimately Sought By Defendant*

As stated above,

> At the outset, "the plaintiff's burden is merely to present evidence from
> which a reasonable jury could conclude that the plaintiff suffered an adverse

employment action under circumstances which give rise to an inference of unlawful discrimination."

\* \* \* \*

If the plaintiff satisfies her prima facie showing, the burden shifts to the defendant to offer evidence of a legitimate, non-discriminatory reason for the adverse employment action. If the defendant succeeds, the burden shifts back to the plaintiff to show that the defendant's proffered reason is a pretext for unlawful discrimination.

*Bryson*, 498 F.3d at 570 (citations omitted). Defendant argues that it has met its burden of demonstrating a legitimate, non-discriminatory reason for the termination (i.e., Plaintiff's failure to sign the Last Chance Agreement after refusing to provide her medical records) and that Plaintiff cannot show that the proffered reason is a pretext for unlawful discrimination.[11] Defendant contends that Plaintiff's refusal to sign the Last Chance Agreement "in essence, indicated she was not willing to abide by the School District's rules and procedures regarding attendance." This was a valid reason given that Defendant was stonewalled by Plaintiff in its attempt to discover her medical records, thereby establishing Plaintiff's refusal to respond to a legitimate request that would permit the School District to evaluate her condition under the School District's rules and procedures regarding attendance.

In conclusion, Plaintiff's refusal to sign the Last Chance Agreement constitutes a legitimate, non-discriminatory reason for the termination because the Last Chance Agreement provided Plaintiff with an opportunity to evade her legal obligation to provide access to her medical records, yet permit

---

[11] It should be noted that Plaintiff has not challenged Defendant's utilization of the *McDonnell Douglas* burden-shifting approach as a means of challenging her FMLA claim. As stated above, it is only necessary to utilize the *McDonnell Douglas* approach "[a]bsent direct evidence of unlawful conduct." *Bryson*, 498 F.3d at 570. Callaghan testified that Plaintiff was terminated because she was uncooperative with Defendant's reasonable request for medical records relevant to Plaintiff's claim under the FMLA.

26

her to keep her job.  Plaintiff rejected that opportunity.  Accordingly, Defendant has demonstrated

a legitimate, non-discriminatory reason for the termination.

## V.  ORDER

For the reasons stated above,

IT IS ORDERED that Defendant's Motion for Summary Judgment [docket entry 18] is

granted.

S/Paul D. Borman
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated:  December 29, 2009

### CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on
December 29, 2009.

S/Denise Goodine
Case Manager